**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DIONNA WILLIAMS, a/k/a Dionna
Lee, a/k/a Dionna Wheat,

Defendant - Appellant.

No. 08-5036

(N.D. Oklahoma)

(D.C. No. 4:07-CR-00152-TCK-2)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

---

Dionna Williams was convicted on five identity-theft charges: one count of

knowing possession of five or more identification documents of other persons

with intent to use them unlawfully, *see* 18 U.S.C. §§ 1028(a)(3), (c)(1), (c)(3)(A);

one count of knowing possession and use of another person's identification with

the intent to commit a federal offense or a state felony, *see id.* §§ 1028(a)(7),

---

[*]After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

(c)(1), (c)(3)(A); one count of defrauding a financial institution, *see id.* § 1344; one count of aggravated identity theft, *see id.* §§ 1028A(a)(1), (c)(4), (c)(5); and one count of conspiracy to commit such offenses, *see id.* § 371. She was sentenced to 70 months' imprisonment.

On appeal Ms. Williams raises two issues. First, she contends that the prosecutor's peremptory challenge to an African-American prospective juror violated the mandates of *Batson v. Kentucky*, 476 U.S. 79 (1986). Second, she contends that the district court miscalculated her offense level under the United States Sentencing Guidelines (USSG) by finding that she organized or led a criminal activity involving five or more participants. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    *BATSON* CHALLENGE

Ms. Williams, an African-American woman, challenges the district court's denial of her objection to the prosecutor's use of a peremptory challenge to strike Richard Mitchell, an African-American prospective juror. We set forth the relevant portions of the voir dire:

> The district court inquired of the entire panel:
>
> Have you ever been involved in a criminal matter in any court that
> concerned yourself, any member of your family or a close friend
> either as a defendant, that would be the person accused of the crime,
> a witness, someone who had some evidence about it, or the victim?
> Anyone been a defendant, a witness, or a victim?

R. Vol. III at 25. After two other prospective jurors responded, Mitchell spoke:

| | |
|---|---|
| Juror Mitchell: | I have represented criminal defendants in a court of law. |
| The Court: | You have represented criminal defendants? |
| Juror Mitchell: | I have. |
| The Court: | As their attorney? |
| Juror Mitchell: | Yes, sir. |
| The Court: | And do you think that would affect your ability to be fair and impartial? |
| Juror Mitchell: | No. |

*Id.* at 26. Shortly thereafter, the court requested a brief autobiographical summary from each member of the venire panel. Mitchell responded: "I live in Bartlesville, work for a major oil company. I have a law degree. Practice law. I work for the—writing contracts for the company." *Id.* 33–34.

Then, in response to the prosecutor's question whether anyone had been the victim of identity theft, Mitchell responded:

| | |
|---|---|
| Juror Mitchell: | I represented a client—I just thought about this—that her credit card was improperly used, and I do pro bono work—she was a senior citizen—and so the case was resolved because the company, once we got the police report and provided them with the evidence that they needed, that it was, in fact, identity theft, the credit card company did the right thing. |
| Prosecutor: | Took off those charges? |
| Juror Mitchell: | Yes. |
| Prosecutor: | You had to write some letters for her? |
| Juror Mitchell: | I did. |
| Prosecutor: | More than one? |
| Juror Mitchell: | Several. |
| Prosecutor: | Make phone calls? |
| Juror Mitchell: | Yes. |
| Prosecutor: | How do you feel about having had to do that? |
| Juror Mitchell: | It's part of my job. |
| Prosecutor: | So as her lawyer, you were helping her out? |

| | |
|---|---|
| Juror Mitchell: | Yes |
| Prosecutor: | You also—you have an interesting life. You work for an oil company, but you also have a law degree and you do some pro bono work as a defense attorney. Have you ever defended anybody who was accused of identity theft? |
| Juror Mitchell: | No. |
| Prosecutor: | Based on your legal background as well as the fact that you have dealt with an identity theft victim before, is there anything in that—either of those areas that would make you feel like you couldn't be fair and impartial in this? |
| Juror Mitchell: | No. |
| Prosecutor: | Even as a defense attorney? |
| Juror Mitchell: | No. I think I could be fair and impartial. |

*Id.* 39–40.

When the prosecutor used one of her peremptory challenges to strike

Mitchell, counsel for Ms. Williams immediately objected under *Batson*. The

district court proceeded as follows:

| | |
|---|---|
| The Court: | All right. What is the nondiscriminatory reason for the challenge? |
| Prosecutor: | Mr. Mitchell is a defense attorney. |
| Defense Counsel: | Your Honor, my response would be that he's mainly a corporate attorney, and he was specifically asked about his experience counseling people on identity theft and fraud. He was actually counseling a victim, not a defendant, and that he has never defended anyone with this type of charge before. |
| Prosecutor: | But he's defended people in criminal cases. He does pro bono work as a defense attorney. I would kick off any defense attorney who was on my jury. |
| The Court: | All right. The challenge will be allowed. The Court also notes for the record that the question was about victims. Defendant indicates the victim |

                              or a witness, and Mr. Mitchell volunteered, and
                              rightfully so, that he does criminal defense work.
        Prosecutor:           Yes, he does.
        The Court:            All right.

*Id.* 58–59.

We see no error in the district court's ruling. *Batson* held that the Equal

Protection Clause prohibits peremptory challenges based on race. When a

defendant claims a *Batson* violation, the trial court is to evaluate the claim in a

three-step process. First, a defendant must make a prima-facie case that the

prosecutor exercised a peremptory challenge on the basis of race. *Hernandez v.*

*New York*, 500 U.S. 352, 358 (1991). The burden then shifts to the prosecutor to

proffer a race-neutral explanation for challenging the prospective juror. *Id.* at

358–59. Third, the trial court must decide whether the defendant satisfied the

ultimate burden of proving that the prosecutor engaged in purposeful

discrimination. *Id.* at 359. If the prosecutor offers a race-neutral explanation for

the peremptory challenge and the trial court rules against the defendant on the

ultimate issue of purposeful discrimination, the first step—whether the defendant

showed a prima-facie case of discrimination—becomes moot. *United States v.*

*Barrett*, 496 F.3d 1079, 1104 (10th Cir. 2007). In this case, because the district

court accepted the prosecutor's proffered race-neutral explanation for her

peremptory challenge of Mitchell, we need not address whether Ms. Williams

made a prima-face case of discrimination.

We review de novo whether the prosecutor's proffered explanation for her challenge of the juror in question was race neutral. *Id.* at 1105. "A race-neutral explanation is simply any explanation, no matter how implausible, that is based on something other than the race of the juror. The proffered reason need not be persuasive, or even plausible, so long as it is facially valid." *Id.* (citation and internal quotation marks omitted). Here, the prosecutor's proffered explanation, that Mitchell had worked as a criminal-defense attorney and that any criminal-defense attorney would have been stricken from the jury, was race-neutral on its face. The burden thus shifted back to Ms. Williams to prove purposeful discrimination.

We review for clear error the trial court's ruling on the ultimate issue of purposeful discrimination. *United States v. Smith*, 534 F.3d 1211, 1226 (10th Cir. 2008). "The district court's answer to the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal, because such a finding largely turns on the trial court's evaluation of the prosecutor's credibility." *United States v. Nelson*, 450 F.3d 1201, 1207 (10th Cir. 2006) (internal quotation marks omitted). The "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365 (internal quotation marks omitted).

There was no clear error here. Trial attorneys are typically concerned about jurors, such as attorneys, who may exercise particular influence on other jurors. When such a juror may harbor an inclination contrary to the trial attorney's case, exercise of a peremptory challenge is common. We have previously affirmed the use of peremptory challenges to strike a juror with even less legal training. In *United States v. Johnson*, 941 F.2d 1102, 1109 (10th Cir. 1991), the prospective juror was an African-American woman who worked as a legal secretary for a Legal Aid attorney. And in *Smith*, 534 F.3d at 1226, one of three reasons given by the prosecutor for striking an African-American juror was that she had taken some law-school courses.

Also instructive is *Nelson*, 450 F.3d at 1209–10, in which we affirmed the use of a peremptory challenge to strike an African-American college professor. The prosecutor explained that she typically struck college professors because they "think [they] know a lot and [are] typically very opinionated." *Id.* at 1206. The district court, in crediting the prosecutor's explanation, "noted that the teaching profession 'does perhaps mark a person as someone who in a jury might be more persuasive' and have 'more tendency to control the outcome.'" *Id.* We believe that the same could be said of attorneys. Accordingly, we find no clear error in the district court's determination that the prosecutor did not engage in purposeful discrimination.

Moreover, Ms. Williams has given us "no reasonable basis for questioning the government's credibility in offering its race-neutral reason[]." *Barrett*, 496 F.3d at 1106. There is no evidence that the prosecutor struck any other African-Americans on the jury panel. On the contrary, an African-American was seated on the jury. Also, as in *Nelson*, none of the information on which the prosecutor relied to strike Mitchell "came to light as a result of follow-up questions from the prosecutor that would suggest an intent to make a case for excluding black panel members or to create cause to strike." 450 F.3d at 1209 (citation and internal quotation marks omitted). Ms. Williams simply argues that Mitchell was not currently a criminal-defense attorney; but the prosecutor could reasonably evaluate Mitchell's attitudes based on earlier work. As for Ms. Williams's contention that Mitchell's criminal-defense work had not been pro bono, the prosecutor could reasonably have inferred from her colloquy with him that the work was pro bono, and the prosecutor stated that she would strike *any* defense attorney (presumably regardless of the pay arrangement).

## II.  SENTENCING

Ms. Williams contends that the district court erred in calculating her offense level under the sentencing guidelines. Her argument concerns a four-level enhancement under USSG § 3B1.1(a), which provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The commentary

to the section defines *participant* as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  USSG § 3B1.1 cmt. n.1.  The commentary also lists the following factors to consider in determining whether a defendant had a leadership or organizational role in the criminal activity:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* § 3B1.1 cmt. n.4.  In our view the trial evidence amply supported the district court's finding that § 3B1.1(a) applied.

Dijon Ray and Letrice Stanley, codefendants of Ms. Williams, entered plea agreements with the government and testified at Ms. Williams's trial.  They provided the following account:

Ray and Stanley were living in Las Vegas, Nevada, when Ms. Williams recruited them.  She paid their airfare to join her in California, where she purchased clothes and wigs for them to wear.  She explained that they needed to disguise themselves to fit the ages of the persons whose identities they were assuming.  Ms. Williams also took them to a pharmacy to have passport-sized photographs made.

According to Ray and Stanley, Ms. Williams had received what they termed "profiles" of the identities they were stealing—names, addresses, Social Security numbers, and other personal information—from a man named Craig. She then delivered the profiles and the photographs to a man named Jaime, telling him that she needed some IDs made. Jaime created fake driver's licenses, Social Security cards, and credit cards containing photographs of Ray and Stanley and the personal information from the profiles. Ms. Williams paid Jaime. That accomplished, the three went to a house where Ms. Williams introduced Ray and Stanley to Billy Easter, a man in his 50s or 60s.

Ms. Williams rented a car and the four drove to Oklahoma City, Oklahoma, where Ms. Williams selected stores at which Ray, Stanley, and Easter used their fake documents to open credit accounts (at least some of which were bank credit cards). Before entering each store, Ms. Williams would distribute the fake documents, which she kept in an envelope in her possession. Ms. Williams helped Ray complete credit applications in the stores and instructed both Ray and Stanley on what to say to store personnel if they asked questions.

After opening credit accounts at several stores in the Oklahoma City area, the group went to Tulsa, Oklahoma, to use their newly opened credit lines to purchase gift cards. Ray and Stanley returned their gift cards to Ms. Williams, who planned to sell them on her return to California. They would receive one-third of the proceeds from the gift cards, and Ms. Williams would keep the rest.

Ray and Stanley also purchased CDs and phone cards with fraudulent traveler's checks distributed by Ms. Williams. Both Ray and Stanley testified that it was Ms. Williams who ran the show, even though Easter was significantly older than all three women.

On appeal Ms. Williams raises two arguments against the district court's finding that § 3B1.1(a) applied: (1) there was insufficient evidence to find that she had a leadership or organizational role in the criminal activity because the only evidence regarding her role was self-serving testimony from two codefendants who received plea deals to testify against her, and (2) there was no basis to find that there were five or more participants in the criminal activity because Craig and Jaime were not sufficiently involved to qualify as participants. We review for clear error the factual findings of the district court relating to sentencing. *See United States v. Bernaugh*, 969 F.2d 858, 862 (10th Cir. 1992).

Ms. Williams's first argument need not detain us long.

> We will not hold that testimony is, as a matter of law, incredible unless it is unbelievable on its face, i.e., testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. In other words, the district court's determination of a witness's credibility at a sentencing hearing is virtually unreviewable on appeal.

*United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003) (citation, brackets and internal quotation marks omitted). We see no reason why the district court could not credit the codefendants' testimony.

We are also unpersuaded by Ms. Williams's second argument. She does not contest that four persons—Ms. Williams herself, Ray, Stanley, and Easter—were participants in the criminal activity. Either Craig or Jaime could be the fifth participant necessary to apply § 3B1.1(a); but she argues that a "largely unidentified fifth participant cannot be manufactured for sentence enhancement purposes." Aplt Br. 26. Sworn testimony, however, is not manufactured evidence. And the testimony of Ray and Stanley easily supports a finding that both Craig and Jaime were knowing participants in Ms. Williams's criminal activity. Their testimony was that Craig provided the "profiles" of the individuals whose identities they stole. And they described how Ms. Williams gave the profiles and the photographs of Ray and Stanley to Jaime and then paid him for the false IDs that he provided.

Ms. Williams cites several appellate decisions as support for her challenge to the § 3B1.1(a) enhancement, but all are readily distinguishable. Contrary to her contention, there is credible testimony showing that Easter, Stanley, and Ray were all subordinates of hers. And it is a fair inference that neither Craig nor Jaime was a one-shot participant in her criminal scheme. Accordingly, we affirm the four-level enhancement.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction and sentence imposed below.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge